**UNITED STATES of America, Plaintiff,**

v.

**Gustavo Gaitan HUERTA, Defendant.**

**No. CR–3–00–074(02).**

United States District Court, S.D. Ohio, Western Division.

Oct. 22, 2002.

---

Sheila Lafferty, Dayton, OH, for Plaintiff.

Vincent Popp, Dayton, OH, for Defendant.

DECISION AND ENTRY OVERRULING DEFENDANT'S MOTION TO SUPPRESS EVIDENCE (DOC. # 18); DECISION AND ENTRY OVERRULING DEFENDANT'S AMENDED MOTION TO SUPPRESS EVIDENCE (DOC. # 22); DECISION AND ENTRY OVERRULING DEFENDANT'S MOTION TO ADOPT OBJECTION AND MOTION TO DISMISS FILED BY CO DEFENDANT (DOC. # 34)

RICE, Chief Judge.

Defendant Gustvo Gaitan Huerta ("Defendant" or "Huerta") is charged in the

Indictment (Doc. # 6) with one count of conspiring to possess with intent to distribute more than five kilograms of cocaine, in violation 21 U.S.C. § 846, and one count of possessing with intent to distribute more than five kilograms of cocaine, in violation of 21 U.S.C. § 841. Those charges stem from the stop and subsequent search of the vehicle in which he and his Co–Defendant, Jesus Laurel ("Laurel"), were traveling on August 3, 2000, by officers of the Ohio State Highway Patrol. During that search, 14 kilograms of cocaine were discovered. This case is now before the Court on the Defendant's Motion to Suppress Evidence (Doc. # 18) and his Amended Motion to Suppress Evidence (Doc. # 22).[1]

With those motions, the Defendant argues that the Court must suppress all evidence which was seized on August 3, 2000, when the Chevrolet van in which he and Huerta had been traveling was stopped and searched by officers of the Ohio State Highway Patrol. In addition, he requests that the Court suppress any statements he may have made. This Court conducted an oral and evidentiary hearing on this motion over four days. In accordance with a briefing schedule established at the conclusion of that evidentiary hearing, the parties have filed their post-hearing memoranda. *See* Docs. ## 52, 57 and 59. The Court now rules upon Huerta's Motion to Suppress Evidence (Doc. # 18) and Amended Motion to Suppress Evidence (Doc. # 22), beginning its analysis by reviewing what the evidence demonstrated.

Shortly before 8:50 a.m., on August 3, 2000, Jon Payer ("Payer"), an officer employed by the Ohio State Highway Patrol, was parked in his cruiser in a crossover in the median of Interstate 70, in Preble County, Ohio, about six miles east of the Ohio Indiana border. Payer saw a Chevrolet van traveling eastbound at a high rate of speed. Using the radar in his cruiser, he was able to ascertain that the van was being driven at 72 miles per hour. After the van had passed his location, Payer observed it move from the left lane to the right lane, without using the directional signal, and follow another vehicle too closely. After observing the driver of the van violate a number of Ohio traffic laws, Payer decided to stop that vehicle. As a consequence, Payer turned on the overhead lights on his cruiser and pulled onto eastbound Interstate 70.[2] Laurel, who was driving the van, immediately pulled that vehicle to the side of the road, using his signal to warn other motorists that he was pulling to the side of the highway.

After parking his cruiser behind the van, Payer exited his patrol car and waved the driver of the van out of that vehicle. Because the windows on the van were covered by curtains, Payer decided not approach that vehicle initially. The driver, Laurel, got out of the van, as directed by Payer. When asked for his driver's license, Laurel indicated that it was in his wallet which he had left in the van. Rath-

---

1. In addition, the Defendant has filed a motion, requesting that the Court dismiss this prosecution for violating the Speedy Trial Act, 18 U.S.C. § 3161. *See* Doc. # 34. Therein, Huerta merely incorporates the arguments in support of a similar motion filed by his Co Defendant, Laurel. By separate Entry, the Court has overruled Laurel's Motion to Dismiss for Violation of Speedy Trial Act (Doc. # 33). Based upon the same reasoning, the Court overrules Huerta's Motion to Adopt Objection and Motion to Dismiss Filed by Co Defendant (Doc. # 34). In that Entry, the Court has also set forth the computations which support its conclusion that this prosecution is in compliance with the Speedy Trial Act.

2. When Payer turned on the overhead lights of his cruiser, he activated a video camera which recorded the stop of the van.

er than permit Laurel to go back to the van to retrieve his wallet and driver's license, Payer told Laurel to sit in his (Payer's) police cruiser and went to the van to get Laurel's wallet, himself.[3] After he had retrieved Laurel's wallet, Payer removed the driver's license from it, noticing that it had expired in 1996. Payer was able to obtain a facially valid driver's license from Huerta, who was riding as a passenger in the van. In addition, both Laurel and Huerta told Payer that Jamie Laurel, the Defendant's brother, owned the van.

About ten minutes after Payer had stopped the van, Sergeant Gooding ("Gooding") of the Ohio State Highway Patrol arrived at the site of the stop. Payer briefed Gooding on the status of the stop and requested that a drug detection dog be brought to the scene to ascertain whether controlled substances were being transported in the van. While Payer and Gooding were waiting for the arrival of the dog detection dog and its handler, they continued their investigation. Payer attempted to ascertain whether the driver's license which Huerta had given him was authentic. When he entered the information from Huerta's driver's license into his computer, Payer received an indication that Huerta's license was not in the system. Payer followed up by entering Huerta's name and date of birth into the computer. Once again, Payer was unable to obtain any information on Huerta. At the same time, Gooding attempted to acquire information about Laurel from the El Paso Intelligence Center. Gooding was in-

formed that Laurel had previously been arrested for smuggling cocaine and that the Immigration and Naturalization Service ("INS") had issued a lookout for him, indicating that they believed that he was back in this country, illegally. After Gooding received that information about Laurel, he read the *Miranda* warnings to that Defendant, in Spanish.

About forty-five minutes after Payer had stopped the van, Trooper Joe Luebbers ("Luebbers") of the Ohio State Highway Patrol and his drug detection dog, Abby, arrived at the site of the traffic stop.[4] As soon as Luebbers walked Abby to the back of the van, she aggressively alerted on that vehicle, indicating that it was being used to transport controlled substances. Officers then began to search the van at the scene of the traffic stop; however, for reasons of officer safety, it was driven to the Eaton Post of the Ohio State Highway Patrol, where the search continued. Officers ultimately discovered 14 kilograms of cocaine in a false compartment built into the rear of the passenger compartment of the van. Subsequently, at the Eaton Post, Officer Del Rio of the Ohio State Highway Patrol read the *Miranda* warnings to both Laurel and Huerta, in Spanish.[5]

As is indicated above, Huerta argues that the Court must suppress the evidence which was seized when the van was searched and that the Court must suppress any statements he may have made to officers. As a means of analysis, the

---

**3.** Payer did not explain the apparent inconsistency in his testimony to the effect that, for purposes of officer safety, it was too dangerous to approach the van when he initially stopped it, yet it was safe enough to do so a matter of moments later.

**4.** Luebbers was the second officer of the Ohio State Highway Patrol assigned to handle Abby, replacing her first handler, Shawn

Davis, when he was promoted to the rank of sergeant. Luebbers testified that he was promoted to sergeant, which resulted in the decision to retire Abby in January, 2001.

**5.** Laurel was not issued any citations for the traffic offenses which Payer had observed, before he had stopped the van, or for driving without a valid driver's license.

Court will rule upon these requests in the above order.

### A. Evidence Seized from the Van

In his post-hearing memoranda, Huerta argues that the Court must suppress the evidence which was seized when the van was searched, because the officers did not have probable cause to believe that contraband or evidence of a crime would be discovered therein. In particular, Huerta contends that the alert on the van was not sufficient to establish probable cause to search that vehicle.[6] For reasons which follow, the Court concludes that the officers had probable cause to believe that they would find controlled substances in the van and that, therefore, its search did not violate the Fourth Amendment.[7]

 It is axiomatic that the warrantless search of an automobile does not violate the Fourth Amendment, if officers have probable cause to believe that the vehicle contains contraband or evidence of a crime. See e.g., California v. Acevedo,

500 U.S. 565, 111 S.Ct. 1982, 114 L.Ed.2d 619 (1991). When a warrantless search has been conducted, the Government has the burden of proving that the search was supported by such probable cause. United ed States v. Zubia–Melendez, 263 F.3d 1155, 1160 (10th Cir.2001); United States v. Castro, 166 F.3d 728, 733 (5th Cir.) (en banc ), cert. denied, 528 U.S. 827, 120 S.Ct. 309, 145 L.Ed.2d 66 (1999). In United States v. Haynes, 301 F.3d 669 (6th Cir. 2002), the Sixth Circuit reiterated certain standards applicable to determining whether probable cause to search a vehicle exists:

> We define probable cause as 'reasonable grounds for belief, supported by less than prima facie proof but more than mere suspicion.' United States v. Bennett, 905 F.2d 931, 934 (6th Cir. 1990). Probable cause exists when there is a 'fair probability that contraband or evidence of a crime will be found in a particular place." ' [United States v. Wright, 16 F.3d 1429, 1437 (6th

---

**6.** It is axiomatic that to challenge the legality of a search, a person must have a reasonable expectation of privacy in the place searched or the things seized and, thus, standing to seek suppression of the items seized. Rakas v. Illinois, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978). Herein, it is difficult to conclude that Huerta has standing to seek the suppression of the evidence seized from the van when it was searched, given that the vehicle was owned by Laurel's brother. However, the Government does not challenge the premise that Huerta had a reasonable expectation of privacy in the van and, thus, standing to seek the suppression of the evidence which was seized when it was searched. Whether a person has standing to seek the suppression of evidence allegedly seized in violation of the Fourth Amendment, is a matter of substantive Fourth Amendment law, rather than a matter of jurisdiction under Article III of the United States Constitution. Id. at 139–40, 99 S.Ct. 421. Therefore, the Government waives the issue of whether a defendant has standing to seek suppression of evidence, by failing to raise it. Steagald v.

United States, 451 U.S. 204, 209, 101 S.Ct. 1642, 68 L.Ed.2d 38 (1981); United States v. Pervaz, 118 F.3d 1, 4 (1st Cir.1997); United States v. Gonzalez, 71 F.3d 819, 828 (11th Cir.1996); United States v. Garcia, 882 F.2d 699, 701 (2nd Cir.), cert. denied, 493 U.S. 943, 110 S.Ct. 348, 107 L.Ed.2d 336 (1989). Were it a matter of jurisdiction, the Government would not have waived it by failing to raise it, and this Court would have been required to raise the issue on its own motion. Consequently, this Court assumes that Huerta has standing to seek the suppression of the evidence seized from the van.

In addition, Huerta has not argued that either the initial stop of the van or the detention between the stop and Abby's alert on that vehicle violated the Fourth Amendment. Such an argument would not have been availing. Indeed, the Court has rejected Laurel's argument that the stop and detention violated the Fourth Amendment.

**7.** The Government does not argue that probable cause to search the van existed, independent of the alert by Abby.

Cir.1994)] (quoting *Illinois v. Gates,* 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983)). Determining whether probable cause existed at the time of the search is a ' "commonsense, practical question" to be judged from the "totality-of-the-circumstances." ' *Id.* (quoting *Illinois v. Gates,* 462 U.S. 213, 230, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983)). In determining whether probable cause exists, we may not look to events that occurred after the search or to the subjective intent of the officers; instead, we look to the objective facts known to the officers at the time of the search. *See United States v. Ferguson,* 8 F.3d 385, 391–92 (6th Cir.1993)(*en banc* ).

*Id.* at 678 (brackets in original).

 Herein, the Government argues that the alert on the van by Abby, Luebbers' drug detection dog, established probable cause to believe that controlled substances would be found therein. In *United States v. Berry,* 90 F.3d 148 (6th Cir.), *cert. denied,* 519 U.S. 999, 117 S.Ct. 497, 136 L.Ed.2d 389 (1996), the Sixth Circuit reiterated that a positive reaction by a properly trained narcotics dog can demonstrate the existence of probable cause for the presence of controlled substances, if the training and reliability of the dog are established. *See also, Hill,* 195 F.3d at 273 ("It is well-established in this Circuit that an alert by a properly-trained and reliable dog establishes probable cause sufficient to justify a warrantless search of a stopped vehicle").

Huerta argues that the alert by Abby on the van did not establish probable cause to search that vehicle (i.e., to believe that contraband or evidence of a crime would be found therein), because the dog was neither properly trained nor reliable. For reasons which follow, this Court finds that the Government proved by the preponderance of the evidence that Abby was properly trained.[8] However, the Court has concerns as to whether the Government proved that she was a reliable drug detection dog. Nevertheless, assuming that Abby's reliability is so deficient that her alert on the van, *alone,* did not establish probable cause, the Court concludes that the totality-of-the-circumstances known to the officers at the time they began to search the van, including Abby's alert on same, established probable cause to believe that narcotics would be found therein, and that, therefore, the search did not violate the Defendant's rights under the Fourth Amendment.[9] The Court so finds by the preponderance or greater weight of the evidence. Consequently, the Court declines to suppress the evidence seized from the van in the subsequent search.

Initially, the Government presented testimony from Abby's original trainer, Brian Woods ("Woods"). Woods has been employed by the Fremont, Ohio, Police Department as an officer since 1985, and as the canine handler for that department since 1989. Woods has certified as a dog handler by the state of Ohio and the North American Police Work Dog Association ("NAPWDA"). The NAPWDA has also certified him as a master trainer. Woods owns Lynwood Kennels, a business which trains drug detection dogs for police departments nationwide, including the Ohio State Highway Patrol. Abby is one of the many drug detection dogs which Woods has trained at his business. He explained

---

**8.** In *United States v. Matlock,* 415 U.S. 164, 178, n. 14, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974), the Supreme Court indicated that "the controlling burden of proof at suppression hearings should impose no greater burden than proof by a preponderance of the evidence."

**9.** It bears emphasis that probable cause is to be determined from the totality-of-the-circumstances. *Haynes,* 301 F.3d at 678.

that dogs initially undergo a screening process, before they are purchased. After Abby had successfully passed the screening process, Woods purchased the dog for the Ohio State Highway Patrol. Thereafter, Abby began an eight-week training course in March, 1996. After successfully completing that training course, Abby was introduced to her first handler, Shawn Davis ("Davis"), an officer with the Ohio State Highway Patrol. Davis and Abby then underwent a four-week training course together. After the completion of that four-week training period, Abby and Davis successfully passed examinations and, thus, became certified by the state of Ohio and NAPWDA.

In November, 1998, after Davis had been promoted to sergeant,[10] Abby returned to Lynwood Kennels to be trained with her second handler, Luebbers. After Abby and Luebbers had successfully passed that course of training, they were given examinations by the state of Ohio and NAPWDA in December, 1998, which they passed, thus becoming certified. In June, 1999, Abby and Luebbers were once again tested by the state of Ohio and the NAPWDA and passed those tests, thus becoming certified for an additional two years.[11] M.J. Watson ("Watson") examined Abby and Luebbers on behalf of the NAPWDA. Watson is a certified master trainer and the Secretary of that organization. He had also tested Abby twice when she was handled by Davis. To pass a test given by the NAPWDA, the dog must find 11 of 12 hides, in a test for three odors or types of drugs, or 15 of 16 hides in a test for four different odors or types of drugs. Watson testified that during her many tests, Abby was always able to find every hide.

Luebbers also testified on behalf of the Government, explaining that he has continued to train Abby on a weekly basis, since the training at Lynwood Kennels in December, 1998. Luebbers has kept some records of those training sessions, which indicate that, while some were relatively brief, others lasted for half of a day or longer. According to Luebbers, while Abby would occasionally fail to detect drugs which he had hidden, she never falsely alerted on an area where drugs had not been hidden.

The foregoing evidence causes this Court to find that the Government met its burden of proving, by the preponderance of the evidence, that Abby was a properly trained drug detection dog.[12] However, making the same finding with respect to her reliability is problematic.

Luebbers testified that, from December, 1998, to August, 2000, Abby had conducted 630 vehicle sniffs, alerting 360 times. Of those 360 alerts, Luebbers indicated that drugs were discovered or there was an indication of residual odors 260 times. In other words, Luebbers testified that Abby was "successful" 260 out of 360 times. Thus, according to Luebbers, Abby had a success or accuracy rate of 72%. According to the Government, such an accuracy rate indicates that Abby was a reliable drug detection dog. A close examination

---

**10.** The Ohio State Highway Patrol did not permit its sergeants to be handlers of drug detection dogs.

**11.** Certification of a dog and its handler is for two years. Although Abby and Luebbers had been tested in December, 1998, they were tested again the following June, because that is when all of the Ohio State Highway Patrol's drug detection dogs were tested, thus putting Abby on the same cycle as the other dogs utilized by the Ohio State Highway Patrol.

**12.** There was evidence that Luebbers did not document every training session he conducted with Abby, although he had been told that it was imperative to do so. That failing does not prevent this Court from finding that Abby was properly trained.

of those statistics and Luebbers' testimony convinces this Court that Abby's accuracy rate was significantly below 72%.

Initially, Luebbers included among the 260 "successful" alerts, instances in which officers who searched the vehicle actually discovered drugs, as well as instances in which, although drugs were not found, someone told the officers that drugs had once been in that vehicle. With respect to the latter category, Luebbers concluded that Abby had alerted on the residual odor left by the drugs which had once been in the vehicle. The flaw in that assumption is that Luebbers included within the category of residual odor alerts instances in which drugs had been in the vehicle at a time long before the alert. For instance he concluded that one particular alert by Abby was "successful," because the car on which she had alerted had been seized for carrying methamphetamine about two years before that alert. Although there was some general testimony about residual odor, the Government failed to introduce expert testimony, establishing that methamphetamine leaves a residual odor so strong that Abby or any other drug detection dog would alert on an automobile in which that substance had been inside approximately two years earlier. Moreover, there is no evidence that Abby was ever certified to detect residual odors.

In addition, in a number of the 260 "successful" alerts, Luebbers concluded that Abby had made a "successful" alert on a vehicle, because its subsequent search revealed trace amounts of marijuana. The problem with concluding that Abby successfully alerted on a vehicle in those instances is that there was no evidence that she was trained or qualified to detect trace amounts of controlled substances. Indeed, the evidence was that the controlled sub-

stances used to train and to test Abby did not fall below ten grams.[13]

As indicated above, Luebbers testified that Abby alerted on vehicles 360 times, with 260 of those alerts being deemed successful and 100 being deemed unsuccessful. Being successful 260 out of 360 times results in a 72% success rate. In this paragraph, the Court discusses a number of alerts which Luebbers disregarded when he computed that 72% success rate. In particular, Luebbers ignored a number of instances in which Abby alerted on a car and an ensuing search of the vehicle failed to result in the discovery of controlled substances. In other words, he did not count these alerts as unsuccessful or in the total number of alerts (i.e., the 360). Luebbers did not consider these alerts to be unsuccessful, because the occupants of the vehicle were not familiar enough with its history to say whether controlled substances had ever been inside of it. Luebbers testified that the vehicle might have been a rental car or that it might have been a used car, recently purchased by its owner. Given that the occupants of those vehicles did not know of their history, Luebbers referred to these alerts as "unknowns." Rather than presenting an evidentiary basis for declining to count these alerts as unsuccessful, the Government offered nothing more than Luebbers' speculation that it is possible that the vehicles could have at some point in the past been used to transport controlled substances. Given the fact that the subsequent search of the vehicle failed to reveal controlled substances, the Court is compelled to conclude that they were unsuccessful. Moreover, it bears emphasis that there is no evidence that a controlled substance had ever been in any of these vehicles. Just as Luebbers' speculation would not be a rea-

---

**13.** Ten grams of a controlled substance exceeds a trace amount. *See* Transcript of October 30, 2000, Hearing at 197 (Luebbers testifying that Abby was not certified to detect trace amounts, because the certifications always used grams).

son for concluding that something which looks, smells and tastes like an apple is not an apple, it fails to convince this Court that these alerts should be considered anything other than unsuccessful. Luebbers' failure to count these alerts as unsuccessful skewed the statistics in favor of Abby's reliability. In the absence of evidence to support Luebbers' decision in that regard, this Court will not speculate that the vehicles may have been used to transport controlled substances and that, therefore, there is a basis for disregarding these alerts, rather than counting them as unsuccessful.

In *United States v. Kennedy*, 131 F.3d 1371 (10th Cir.1997), *cert. denied*, 525 U.S. 863, 119 S.Ct. 151, 142 L.Ed.2d 123 (1998), the Tenth Circuit held that a drug detection dog with a 70–80% success rate is reliable. Herein, Luebbers testified that Abby had a 72% success rate; however, the above discussion convinces this Court to find that Luebbers' statistics overstate Abby's reliability. A close analysis of Luebbers' testimony during cross-examination reveals that Abby's success rate was below that figure. Due to the fact that the Government did not provide complete records of each alert by Abby,[14] the canine's precise success rate will never be known. However, when one excludes from the "successful" alerts those instances where a trace amount was found or where Luebbers assumed that residual odor was present, and when one adds to the total number of alerts and to the number of unsuccessful alerts those instances which Luebbers had excluded as unknown, Abby's success rate is approximately 65%. The Government has not cited, nor has research revealed, any decision in which a court held that a drug detection dog with a 65% accuracy rate is reliable. Consequently, this Court is unwilling to conclude that Abby's alert on the van, *alone*, established probable cause to search that vehicle. Rather, the Court will assume for sake of argument that Abby's diminished reliability prevents it from reaching that conclusion. Nevertheless, this Court concludes that the totality-of-the-circumstances, *including the dog's alert on the van*, establish probable cause to believe that contraband or evidence of a crime would be found within the van.

As an initial matter, it must be remembered that the Court is being called upon to determine whether the officers had probable cause to believe that contraband or the evidence of a crime would be found in the van. Probable cause is defined as a "fair probability that contraband or evidence of a crime will be found in a particular place." *Haynes*, 301 F.3d at 678 (internal quotation marks and citations omitted). The Sixth Circuit has held that probable cause is established when a particular fact is more likely than not. *United States v. Jones*, 641 F.2d 425 (6th Cir.1981) (indicating that the question of whether officers had probable cause to search for the defendant in the residence of the defendant's brother's girlfriend depended upon whether it was more likely than not that he would be found therein).[15] The fact that a

14. The Government provided reports on 187 alerts by Abby, which included both instances when Abby alerted on a car and instances when she alerted when conducting a sniff in prison. The Government did not provide reports on all 360 alerts by Abby.

15. Other circuits have held that probable cause need not be supported by evidence establishing that a fact is more likely than not

(i.e., that it is more likely than not that the defendant committed the crime for which he is being arrested). *See United States v. Mounts*, 248 F.3d 712, 714 (7th Cir.2001); *United States v. Adcock*, 756 F.2d 346, 347 (5th Cir.), *cert. denied*, 471 U.S. 1102, 105 S.Ct. 2329, 85 L.Ed.2d 847 (1985); *United States v. Melvin*, 596 F.2d 492, 495 (1st Cir. 1979). Nevertheless, this Court follows the Sixth Circuit's precedent, which, in *Jones*, in-

trained and certified drug detection dog alerted on the van, thus indicating that narcotics were located inside, certainly contributes to a finding that it was more likely than not that narcotics would be found inside the van, even though the reliability of the drug detection dog was only 65%.

■■■ The officers had other information which contributed to the conclusion that there was probable cause to search the van. For instance, the officers knew that Laurel had previously been arrested for smuggling cocaine and that the INS had issued a lookout for him, indicating that they believed that he was back in this country, illegally. Probable cause to search a vehicle for evidence of a particular crime is supported by the fact that one of its occupants had been previously arrested for that crime. *See United States v. Townsend*, 305 F.3d 537, 544–45 (6th Cir.2002) (agreeing with Government's proposition that previous arrest of one of the occupants of a vehicle for a weapons offense would contribute to probable cause to search it for weapons); *United States v. McSween*, 53 F.3d 684, 686 (5th Cir.) (holding that defendant's prior arrests on narcotics charges contributed to the finding of probable cause to search his vehicle for marijuana), *cert. denied*, 516 U.S. 874, 116 S.Ct. 199, 133 L.Ed.2d 133 (1995); *Greenstreet v. County of San Bernardino*, 41 F.3d 1306, 1309 (9th Cir.1994) (noting that "the use of prior arrests and convictions can be helpful in establishing probable cause"); *United States v. Jakobetz*, 955 F.2d 786, 803 (2nd Cir.1992) (holding that when determining whether a requested warrant is supported by probable cause the magistrate "may take into account a prior similar arrest"); *United States v. Thomas*, 913 F.2d 1111, 1116 (4th Cir.1990) (holding that the defendant's prior arrests on narcotics charges were probative of the issue of whether there was probable cause to search his vehicle for drugs). Moreover, Laurel did not possess a valid drivers license. In addition, although Huerta produced a seemingly valid drivers license, Payer was unable to confirm its validity through a search of national data bases. It has been held that an individual's lack of a valid drivers license contributes to a finding of probable cause. *United States v. Johnson*, 1997 WL 124269 (N.D.Ill. 1997), *affirmed*, 223 F.3d 665 (7th Cir. 2000), *cert. denied*, 534 U.S. 829, 122 S.Ct. 71, 151 L.Ed.2d 37 (2001).

In sum, the Court concludes that the totality-of-the-circumstances demonstrate the existence of probable cause to believe that the van contained narcotics therein.

Based upon the foregoing, the Court overrules the Defendant's Motion to Suppress Evidence (Doc. # 18), and Amended Motion to Suppress Evidence (Doc. # 22), as they relate to the evidence which was seized when the van was searched.[16]

dicated that probable cause is established when a fact is more likely than not.

16. In *United States v. Kimes*, 246 F.3d 800 (6th Cir.2001), *cert. denied*, 534 U.S. 1085, 122 S.Ct. 823, 151 L.Ed.2d 705 (2002), the Sixth Circuit concluded that the inevitable discovery doctrine prevented the suppression of evidence seized as a result of the warrantless search of the defendant's vehicle, even though it had assumed that the search had violated the Fourth Amendment. Therein, the defendant was arrested near his vehicle which was parked on the grounds of a Veterans Administration Hospital. The Sixth Circuit held that the evidence seized from the defendant's automobile would have been inevitably discovered, because it would have been searched prior to being impounded, due to the fact that the defendant had been arrested. The *Kimes*, court noted that the inevitable discovery exception to the exclusionary rule requires that the "court to determine, viewing affairs as they existed at the instant before the unlawful search, what would have happened had the unlawful search never occurred." *Id.* at 804 (internal quotation marks and citation omitted). Herein, the officers learned that the INS believed that Laurel was once again

## B. Statements

In his post-hearing memorandum, Huerta argues that the Court should suppress any statements he may have made after the van had been stopped and before he had been given the warnings required by *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The Defendant contends that the statements he made before he had been given his *Miranda* warnings must be suppressed, because he had been detained and, thus, had been subjected to a custodial interrogation while in the back seat of Payer's cruiser.[17] This Court cannot agree. In *Berkemer v. McCarty*, 468 U.S. 420, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984), the Supreme Court held that a police officer who stops a motorist for a traffic offense need not provide *Miranda* warnings before interrogating the motorist, even though he has been detained as a result of the traffic stop. *Id.* at 435–42, 86 S.Ct. 1602. Rather, the *Berkemer* Court reiterated that "the safeguards prescribed by *Miranda* become applicable as soon as a suspect's freedom of action is curtailed to a 'degree associated with a formal arrest.'" *id.* at 440, 86 S.Ct. 1602 (quoting *California v. Beheler*, 463 U.S. 1121, 1125, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983)). Herein, the evidence would not support a finding that Huerta's freedom of action was curtailed to a degree associated with a formal arrest.

Huerta also argues that the Court should suppress any statements he made at the Eaton Post of the Ohio State Highway Patrol, after the cocaine had been discovered, because those statements are the product of the illegal search of the Chevrolet van. The Court cannot agree. Evidence which is considered "fruit" of a Fourth Amendment violation must be suppressed, along with the evidence that was obtained as a direct result of that illegality. *United States v. Dice*, 200 F.3d 978 (6th Cir.2000). Therein, the Sixth Circuit discussed that principle:

> The general remedy for a Fourth Amendment violation is that evidence obtained due to the unconstitutional search or seizure is inadmissible. The scope of evidence to be excluded sweeps broadly, including both "[e]vidence obtained as a direct result of an unconstitutional search or seizure," as well as evidence that is considered the " 'fruit' of a prior illegality" that was "come at by exploitation of [the initial] illegality." *Segura v. United States*, 468 U.S. 796, 804, 104 S.Ct. 3380, 82 L.Ed.2d 599 (1984); *see also New York v. Harris*, 495 U.S. 14, 19, 110 S.Ct. 1640, 109 L.Ed.2d 13 (1990) ("[T]he indirect fruits of an illegal search or arrest should be suppressed when they bear a sufficiently close relationship to the underlying illegality.") (citation omitted); *Murray v. United States*, 487 U.S. 533, 536–37, 108 S.Ct. 2529, 101 L.Ed.2d 472 (1988) (stating that the exclusionary rule prohibits evidence "that is the product of the primary evidence, or that is otherwise ac-

---

in the country illegally. Moreover, although Huerta was able to produce a drivers license, an examination of national computer data bases did not confirm that the validity of that license. Consequently, it appears that, if the officers had not searched the van after Abby had alerted on it, since they would not have permitted either occupant to drive it away, it would have been impounded and they nevertheless would have searched it. Perhaps, the Government did not rely upon the inevitable

discovery doctrine, because the 14 kilograms of cocaine were found in a false compartment built into the rear of the passenger compartment of the van and the secret compartment would not have been discovered during an impoundment search.

17. Some of these statements were made by Huerta, before the van was searched and the 14 kilograms of cocaine were discovered therein.

quired as an indirect result of the unlawful search, up to the point at which the connection with the unlawful search becomes so attenuated as to dissipate the taint") (citation omitted).

*Id.* at 983. Herein, given the Court's above conclusion that the search of the van did not violate the Fourth Amendment, Huerta's statements at the Highway Patrol Post are not fruit of a violation of the Fourth Amendment.

Accordingly, the Court overrules Defendant's Motion to Suppress Evidence (Doc. # 18) and Amended Motion to Suppress Evidence (Doc. # 22), as they relate to his statements.

In sum, the Court overrules the Defendant's Motion to Suppress Evidence (Doc. # 18) and Amended Motion to Suppress Evidence (Doc. # 22), in their entirety.