KAREN NELSON MOORE, Circuit Judge,
dissenting.
During the guilt phase of Marvin Ga-brion’s trial, the jury was required to make a determination on an extremely complicated and hotly contested element of the offense — whether Gabrion committed the murder in the Manistee National Forest or in the State of Michigan. Their answer not only resolved an interesting academic issue of federal jurisdiction, but also exposed Gabrion to a sentence of death. Given the direct connection between this determination and the resultant penalty phase, Gabrion sought to introduce as mitigation both a residual-doubt argument and evidence of the location of the crime. The district court denied this request, and the penalty phase proceeded with no mention of this circumstance of the offense. At the end of the penalty phase, Gabrion sought to have the jury instructed in accordance with Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000) — that in order to sentence Gabrion to death, the jury would have to find beyond a reasonable doubt that the aggrava-tors outweighed the mitigators. The district court denied this request as well.
The majority concludes that neither of these determinations constituted errors. Because I believe that the district court erred in making each of these determinations, as well as in excluding certain jurors during voir dire, and that Gabrion’s constitutional rights were violated as a result, I cannot agree. I would vacate Gabrion’s sentence and remand for a new penalty hearing. I therefore respectfully dissent.
I. PENALTY-PHASE ERRORS
A. Michigan’s Lack of a Death Penalty as Mitigating Evidence
Gabrion articulates three theories in support of his contention that the district court erred by precluding him from presenting evidence of the location of the crime during the penalty phase of his trial, one arising under the Eighth Amendment and two based on the Federal Death Penalty Act (“FDPA”). Although I believe that each of these theories requires admission of this evidence, I am most troubled by the majority’s decision to eviscerate the decades-old relevance standard established by the Supreme Court in order to achieve the majority’s desired result.
Replacing constitutionality with morality as the benchmark of relevance narrows the scope of evidence that a defendant may present as mitigation during the penalty phase of his trial. Given the importance of this constitutional right, I cannot support transforming the standard in such a way that precludes a defendant from presenting constitutionally relevant evidence simply because a panel of judges cannot see its moral relevance. Whatever the majority thinks of Gabrion’s moral culpability or the horrific nature of the crimes he committed, these opinions cannot displace the constitutional relevance of the evidence Gabrion seeks to present. I would allow Gabrion to present evidence of the location of the crime — an element of the offense— based on the constitutional standard employed by the Supreme Court, and alternatively, under the FDPA.
1. Eighth Amendment
A defendant has an Eighth Amendment right to present all evidence at the penalty *538 phase of a capital trial that is relevant to “any aspect of a defendant’s character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death.” Lockett v. Ohio, 438 U.S. 586, 604, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978). The Supreme Court has made clear that this is an expansive right:
When we addressed directly the relevance standard applicable to mitigating evidence in capital cases ..., we spoke in the most expansive terms. We established that the meaning of relevance is no different in the context of mitigating evidence introduced in a capital sentencing proceeding than in any other context, and thus the general evidentiary standard — any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence — applies.
Tennard v. Dretke, 542 U.S. 274, 284, 124 S.Ct. 2562, 159 L.Ed.2d 384 (2004) (internal quotation marks omitted).
Rather than apply the Supreme Court’s conception of relevance, the majority fashions its own standard — “mitigation evidence encompasses both culpability and character, all to the extent relevant to the defendant’s personal responsibility and moral guilt.”[1] Maj. Op. at 522 (internal quotation marks omitted). However, this standard addresses only a part of what would be admissible under the relevance standard outlined by the Supreme Court. Critically, this new standard allows the majority to avoid engaging in any analysis concerning whether the evidence Gabrion seeks to present is a circumstance of the offense, a consideration included expressly in the Supreme Court’s relevance standard. See Gregg v. Georgia, 428 U.S. 153, 189, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976) (“We have long recognized that for the determination of sentences, justice generally requires that there be taken into account the circumstances of the offense together with the character and propensities of the offender.”) (internal quotation marks and alterations omitted). That the evidence at issue here was an element of the offense only underscores the consequences of the majority’s decision to transform the standard. Under the Supreme Court’s standard, evidence related to an element of the offense is unequivocally relevant, yet under the novel standard employed by the majority, a court may skirt the inquiry most relevant to its admission.
Additionally, the Supreme Court has indicated that evidence may “ha[ve] nothing to do with his culpability for [the] offense,” yet be admissible nonetheless. Maj. Op. at 522. As explained by Justice Stevens, “a jury must be allowed to give weight to any aspect of a defendant’s character or history that may provide a basis for a sentence other than death, even if such evidence does not tend to reduce the defendant’s culpability for his crime.” Wong v. Belmontes, 558 U.S. 15, 28, 130 S.Ct. 383, 175 L.Ed.2d 328 (2009) (Stevens, J., concurring) (internal quotation marks omitted); see also Brewer v. Quarterman, 550 U.S. 286, 289, 127 S.Ct. 1706, 167 L.Ed.2d 622 (2007) (acknowledging that mitigation includes more than that which addresses culpability: “we have long recognized that a sentencing jury must be able to give a reasoned moral response to a defendant’s mitigating evidence-partieu-larly that evidence which tends to diminish his culpability”) (internal quotation marks omitted). The fact that “most of the evidence the Supreme Court has deemed mitigating was evidence relevant to the defen *539 dant’s personal culpability for his crime” does not eliminate the broad constitutional protections for those defendants who wish to present evidence unrelated to their moral culpability. Maj. Op. at 521.
Notably, the majority opinion is devoid of any examples of the Supreme Court having excluded mitigation evidence on the basis that it did not meet the constitutional minimum, let alone any evidence similar to that which Gabrion seeks to introduce.[2] Instead, the cases cited by the majority reflect the inclusive nature of the Eighth Amendment standard. A review of post-Furman cases that consider mitigation evidence reveals that the Supreme Court consistently employs iterations of the expansive relevance standard. See, e.g., Abdul-Kabir v. Quarterman, 550 U.S. 233, 248, 127 S.Ct. 1654, 167 L.Ed.2d 585 (2007) (“In those cases, we emphasized the severity of imposing a death sentence and that the sentencer in capital cases must be permitted to consider any relevant mitigating factor.”) (internal quotation marks omitted); Tennard, 542 U.S. at 285, 124 S.Ct. 2562 (explaining that a jurisdiction “cannot bar the consideration of evidence if the sentencer could reasonably find that it warrants a sentence less than death”) (internal quotation marks and alteration omitted); Payne v. Tennessee, 501 U.S. 808, 822, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991) (“[V]irtually no limits are placed on the relevant mitigating evidence a capital defendant may introduce concerning his own circumstances.”); Lockett, 438 U.S. at 604, 98 S.Ct. 2954 (“[T]he Eighth and Fourteenth Amendments require that the sentencer, in all but the rarest kind of capital ease, not be precluded from considering, as a mitigating factor, any aspect of a defendant’s character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death.”) (internal footnote omitted).[3]
*540 The Supreme Court has continued to apply such an expansive standard with good reason. Without an opportunity to present mitigation evidence — the means by which the jury considers the individual defendant and the circumstances of his offense — the death penalty would be unconstitutional. Woodson v. North Carolina, 428 U.S. 280, 304, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976) (“[I]n capital cases the fundamental respect for humanity underlying the Eighth Amendment requires consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death.”) (citation omitted) (emphasis added); see also Kansas v. Marsh, 548 U.S. 163, 171, 126 S.Ct. 2516, 165 L.Ed.2d 429 (2006) (“This Court noted that, as a requirement of individualized sentencing, a jury must have the opportunity to consider all evidence relevant to mitigation.”).[4]
Under the correct standard, the evidence that Gabrion sought to introduce is unquestionably relevant. When the location of the crime is what makes a defendant eligible for the death penalty in the first place, the location becomes a “circumstance of the offense” that could justify a sentence less than death. Indeed, in this case, the location of the body was an element of the offense.[5] A juror may have *541 been less inclined to impose the death penalty for a crime committed in Michigan if he knew that the United States’s ability to prosecute the crime and impose a sentence of death was determined by a distance roughly the length of a hockey rink. Certainly, not every juror would be softened by the knowledge that Michigan is a non-death-penalty state and that Gabrion was eligible for the death penalty only because his crime was committed on federal lands within Michigan — a conclusion that itself was extremely complicated and hotly contested. But the fact that some jurors reasonably may be inclined not to impose the death penalty as a result of such information makes the excluded information mitigating.
Moreover, the Supreme Court has rebuked attempts by the courts to narrow the scope of mitigating evidence, making clear that it is not a judge’s role to weigh in on the moral relevance of evidence. In Tennard, for example, the Supreme Court rejected the Fifth Circuit’s constitutional-relevance screening test and its nexus requirement, reasoning that these additional hurdles have “no basis in our precedents and, indeed, [are] inconsistent with the standard we have adopted for relevance in the capital sentencing context.” 542 U.S. at 287, 124 S.Ct. 2562. The Court further identified the role of a federal appellate court regarding mitigation evidence: “to say that only those features and circumstances that a panel of federal appellate judges deems to be severe ... could have such a tendency is incorrect. Rather, the question is simply whether the evidence is of such a character that it might serve as a basis for a sentence less than death.” Id. (internal quotation marks omitted).
Accordingly, we are' not charged with excluding evidence that is not morally relevant. Rather, we must uphold a defendant’s' right to present evidence that is constitutionally relevant. That the majority considers Gabrion’s evidence morally unpersuasive is of no-matter. Courts determine whether evidence is constitutional-, ly relevant, much of which addresses moral culpability, and that evidence is relied upon by the jury to make a reasoned moral judgment. If evidence meets the low constitutional bar established by Supreme Court — which it unequivocally does here — then it must be allowed in. The majority deprives Gabrion of his Eighth Amendment right to present constitutionally relevant mitigation evidence.
2. Federal Death Penalty Act
Gabrion’s constitutional right to present mitigation evidence is distinct from his statutory right to present mitigation evidence under the FDPA. Under § 3592(a), “the finder of fact shall consider any mitigating factor,” including a list of seven specific factors and an eighth category requiring consideration of “[o]ther factors in the defendant’s- background, record, or character or any other circumstance of the offense that mitigate against imposition of the death sentence.” 18 U.S.C. § 3592(a). The parties debate whether these eight categories are exhaustive, how broadly to read this eighth category if they are, and most importantly, whether the information *542 about Michigan qualifies under any of these readings. The majority ultimately concludes that it does not, relying on the unfounded assumption that Congress limited the protections in § 3592(a) to the constitutional minimum. Because I believe the FDPA allows a defendant to introduce evidence beyond the constitutional minimum, I cannot agree.
As an initial matter, I remain confounded as to how evidence relating to an element of the offense does not qualify as a “circumstance of the offense” under § 3592(a)(8). The majority once again refuses to engage in this analysis, choosing instead to rely upon unsupported assertions, namely that § 3592(a) is based in the same moral principles as the majority’s novel relevance standard. Even assuming, though, that an element of the offense is somehow outside the scope of § 3592(a)(8), the expansive nature of § 3592(a) as a whole requires permitting Gabrion to present this evidence. By its own language, the § 3592(a) list is non-exhaustive and merely illustrative. The first indication of § 3592(a)’s expansive nature is reflected in the initial preface, where Congress stated that the jury “shall consider any mitigating factor.” Id. (emphasis added). Congress subsequently used the open-ended word “including” when listing the enumerated examples of mitigating factors. Id. The majority does not account for this open-ended language in any meaningful way, focusing instead on reiterating its constitutional argument by pointing to the similarities between the language of the eighth factor and the constitutional standard set forth by the Supreme Court.
The government’s only argument in response is that the existence of the eighth category would be “superfluous” if the words “any mitigating factor” are given broader meaning, but the government fails to explain how this list is any different from other illustrative lists. As explained by the Fifth Circuit when rejecting a similar argument relating to aggravating factors under the FDPA, “ ‘[i]t is “a cardinal principle of statutory construction” that “a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.” ’ ” United States v. Robinson, 367 F.3d 278, 293 (5th Cir.2004) (quoting TRW, Inc. v. Andrews, 534 U.S. 19, 31, 122 S.Ct. 441, 151 L.Ed.2d 339 (2001)). The merits panel correctly concluded that purely as a matter of statutory interpretation, defense counsel is entitled to argue any point that “could conceivably make a juror question the appropriateness in the case of imposing a sentence of death.” United States v. Gabrion, 648 F.3d 307, 326 (6th Cir.2011), reh’g en banc granted, op. vacated (6th Cir. Nov. 17, 2011). The government does not even try to argue that this evidence could not even “conceivably” bear on a juror’s decision of whether death was justified under this standard.
Perhaps the strongest evidence in support of an expansive reading of § 3592(a) is found in the interpretations of other FDPA provisions. Specifically, our sister circuits have consistently interpreted §§ 3592(b), (c), and (d) and 3593(a), the aggravating-factor provisions, as expansive. These interpretations are instructive, as the aggravating-factor provisions employ the same terms that are at issue in the mitigating-factor provision. Each provision relating to non-statutory aggravating factors in § 3592 states as follows: “The jury, or if there is no jury, the court, may consider whether any other aggravating factor for which notice has been given exists.” § 3592(b), (c), and (d) (emphasis added). Additionally, § 3593(a) prescribes that “[t]he factors for which notice is pro *543 vided under this subsection may include factors concerning the effect of the offense on the victim and the victim’s family ... and any other relevant information.” Id. § 3593(a) (emphasis added).
Certain circuits base their interpretations on the plain language of the terms at issue. For example, the Fourth Circuit has explained that “the text of [§ 3593(a) ] is illustrative rather than exhaustive, identifying some kinds of aggravating factors and evidence that the prosecution’s notice to the defendant ‘may include’ and concluding with a catchall permitting the prosecution to present ‘any other relevant information.’” United States v. Runyon, 707 F.3d 475, 501 (4th Cir.2013) (quoting § 3592(c)). Given this language, the court determined that Runyon, in arguing for a more restrictive interpretation, was “creating restrictions ... out of whole cloth.” Id. Likewise, the First Circuit indicated that “[t]he FDPA broadly provides that the government may present any information relevant to an aggravating factor for which notice has been provided.” United States v. Sampson, 486 F.3d 13, 44 (1st Cir.2007) (internal quotation marks and alteration omitted). Finally, the Tenth Circuit explained that “the use of the phrases ‘may include’ and ‘any other relevant information’ clearly suggests that Congress intended to permit the admission of any other relevant evidence, including, as authorized by Payne, evidence giving the jury a glimpse of the victim’s personality and the life he led.” United States v. Barrett, 496 F.3d 1079, 1099 (10th Cir.2007).
Even more notable, though, are the circuits that have expressly compared the terms found in the mitigation provision with those in the non-statutory-aggrava-tors provision in order to establish the FDPA’s expansiveness. For example, the Fifth Circuit asserted that the breadth of the non-statutory-aggravators provision is supported by that of the mitigation provision: “The statute provides that the jury may consider such determinations in reaching its decision to recommend death, just as it permits the jury to consider any mitigating factors not specified in the statute.” Robinson, 367 F.3d at 293. In support of this assertion, the court compared the language in § 3592(a) — “ ‘the finder of fact shall consider any mitigating factor, including the following’ eight specified factors” — with the language in § 3592(c)— “ ‘the jury ... may consider whether any other aggravating factor for which notice has been given exists.’ ” Id. at 293 n. 23 (quoting § 3592(a), (c)).
Additionally, the Second Circuit referred expressly to § 3592(c) in interpreting § 3593(a), the provision allowing victim-impact statements to be presented as a non-statutory aggravating factor, as expansive:
We read [§ 3593(a) ] as language of inclusion, not exclusion. It speaks to what “may be included.” ... see also 18 U.S.C. § 3592(c) (“The jury, or if there is no jury, the court, may consider whether any other aggravating factor for which notice has been given exists.”). The final phrase (“and any other relevant information”), though ambiguous, is read most naturally as a catch-all for what may be deemed “relevant” by the court.
United States v. Whitten, 610 F.3d 168, 188 (2d Cir.2010) (internal citations and alterations omitted). In a different case, the Second Circuit again touched on the expansiveness of both aggravating and mitigating factors: “the Supreme Court has also made clear that in order to achieve such ‘heightened reliability! ]’ [in imposing the death sentence,] more evidence, not less, should be admitted on the presence or absence of aggravating and *544 mitigating factors.” United States v. Fell, 360 F.3d 135, 143 (2d Cir.2004) (citing Gregg, 428 U.S. at 203-04, 96 S.Ct. 2909).
Against this backdrop, § 3592(a) must be read as inclusive. I therefore cannot agree with the majority’s interpretation of this provision, or with its refusal to address the “circumstance of the offense” language in § 3592(a)(8). For these reasons, I believe the district court erred in denying Gabrion’s request to admit evidence relating to the location of the offense.
3. Residual Doubt
Even assuming there is no constitutional right to present a residual-doubt argument, Gabrion should have been allowed to raise this argument under the FDPA. It cannot be disputed that the FDPA allows a defendant to proffer evidence of certain types of residual doubt. For example, a defendant may present evidence that he “was under unusual and substantial duress, regardless of whether the duress was of such a degree as to constitute a defense to the charge.” 18 U.S.C. § 3592(a)(2). Similarly, the FDPA permits evidence that “[t]he defendant’s capacity to appreciate the wrongfulness of the defendant’s conduct or to conform conduct to the requirements of law was significantly impaired, regardless of whether the capacity was so impaired as to constitute a defense to the charge,” and that “the defendant’s participation was relatively minor, regardless of whether the participation was so minor as to constitute a defense to the charge.” Id. § 3592(a)(1), (3). The FDPA also allows the defendant to present evidence that “[t]he defendant committed the offense under severe mental or emotional disturbance.” Id. § 3592(a)(6).
Each of these subsections thus allows a reevaluation by the jury during the penalty phase of the same evidence presented during the guilt phase. And, given that the penalty phase is under way, this is undoubtedly evidence that the jury found unpersuasive concerning one of the elements of the offense during the guilt phase. Cf. Oregon v. Guzek, 546 U.S. 517, 523, 126 S.Ct. 1226, 163 L.Ed.2d 1112 (2006) (explaining that a capital defendant did not have a constitutional right to present new alibi evidence at a resentencing for a prior conviction, but “to the extent it is evidence he introduced at [the time of the original trial], he is free to introduce it now, albeit in transcript form”).
The majority’s conclusion that Gabrion is barred from presenting evidence of the location of the offense' — first because it “was an issue extensively litigated during the guilt phase of Gabrion’s trial” and second because the jury had already “found beyond a reasonable doubt that Gabrion killed Timmerman inside the Forest”— therefore cannot be extended to the FDPA, as the principle that all relitigation is precluded under the FDPA would not comport with the plain language of the statute. Maj. Op. at 524-25. The FDPA expressly permits relitigation of elements of an offense, and I cannot see any logic in an arbitrary determination that evidence concerning the location of the offense is one that must be precluded. The district court should have allowed Gabrion to present residual-doubt evidence under the FDPA.
Finally, even if the FDPA does not require the court to instruct the jury on this evidence, Gabrion’s counsel should not have been forbidden from presenting this argument in closing arguments, an issue left unaddressed by the majority.[6] Lock- *545 hart v. McCree, 476 U.S. 162, 181, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986) (“Such residual doubt has been recognized as an extremely effective argument for defendants in capital cases”) (internal quotation marks omitted); Moore v. Mitchell, 708 F.3d 760, 788 (6th Cir.2013) (recognizing residual doubt as a mitigation theory); Webb v. Mitchell, 586 F.3d 383, 394-95 (6th Cir.2009) (discussing residual-doubt theory raised at mitigation), cert. denied, 559 U.S. 1076, 130 S.Ct. 2110, 176 L.Ed.2d 738 (2010); Hawkins v. Coyle, 547 F.3d 540, 548 (6th Cir.2008) (noting that arguing residual doubt at mitigation was a “strategy endorsed” by the Supreme Court and the Ohio Supreme Court at the time of defendant’s trial in 1989), cert. denied, 558 U.S. 1013, 130 S.Ct. 553, 175 L.Ed.2d 385 (2009); Scott v. Mitchell, 209 F.3d 854, 881-82 (6th Cir.2000) (decision by counsel to pursue residual-doubt theory at mitigation not “objectively unreasonable”), cert. denied, 531 U.S. 1021, 121 S.Ct. 588, 148 L.Ed.2d 503 (2000). If such theories are deemed positions pursued by reasonable counsel, it is difficult to call them now wholly irrelevant to mitigation.
B. Balancing Factors “Beyond a Reasonable Doubt”
The only relevant question on this issue is whether the jury must determine that the aggravating factors substantially outweigh the mitigating factors in order for Gabrion to be sentenced to death. Because I believe that the answer to that question is “yes,” that determination must be made beyond a reasonable doubt.
1. Apprendi and the FDPA
Under Apprendi, “any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury and proved beyond a reasonable doubt.” 530 U.S. at 490, 120 S.Ct. 2348. The Supreme Court made clear in Apprendi that the state’s use of the term “sentence enhancement” had no bearing on the inquiry. Id. at 476, 120 S.Ct. 2348. When “a defendant faces punishment beyond that provided by statute when an offense is committed under certain circumstances but not others,” those circumstances that lead to the increase in the authorized penalty must be submitted to a jury and proven beyond a reasonable doubt. Id. at 484, 120 S.Ct. 2348.
The rule is no different in death-penalty cases. “The dispositive question ... is one not of form, but of effect.” Ring v. Arizona, 536 U.S. 584, 602, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002) (internal quotation marks omitted). If a finding leads to “an increase in a defendant’s authorized punishment,” that finding must be found by a jury beyond a reasonable, doubt — “no matter how the State labels it.” Id. For example, because Arizona’s enumerated aggravating factors are necessary for the imposition of the death penalty, they “operate as ‘the functional equivalent of an element of a greater offense,’ [and] the Sixth Amendment requires that they be found by a jury.” Id. at 609, 122 S.Ct. 2428 (quoting Apprendi, 530 U.S. at 494 n. 19, 120 S.Ct. 2348) (internal citation omitted).
Two years after Ring, the Supreme Court — for a third time — rejected a state’s attempt to find a linguistic loophole. In Blakely v. Washington, 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004), the state argued that the “statutory maximum” for the crime in question was ten years, and technically under the statute it *546 was. Id. at-303, 124 S.Ct. 2531. But the Supreme Court ignored the state’s labels — because the statute permitted the ten-year maximum only if there were sufficient reasons to justify the “exceptional sentence,” the true maximum for the defendant for Apprendi purposes was not ten years. Id. at 304-05, 124 S.Ct. 2531. “Whether the judge’s authority to impose an enhanced sentence depends on finding a specified fact (as in Apprendi), one of several specified facts (as in Ring), or any aggravating fact (as here), it remains the case that the jury’s verdict alone does not authorize the sentence.” Id. at 305, 124 S.Ct. 2531. The first question is therefore not a constitutional question but simply a statutory one: What does the FDPA require in order to sentence someone to death?
Although it is true that the FDPA forbids the imposition of the death penalty unless at least one aggravating factor listed in § 3592 is unanimously found to exist beyond a reasonable doubt, the death penalty is authorized only if the jury (under the statute) then decides that “all the aggravating factor or factors found to exist sufficiently outweigh all the mitigating factor or factors found to exist to justify a sentence of death.” 18 U.S.C. § 3593(e).[7] Before this determination is made, a sentence of death is simply not an option. Even when there are no mitigating factors, the death penalty is still not authorized (again, under the statute) unless the jury finds that “the aggravating factor or factors alone are sufficient to justify a sentence of death.” Id. Under the plain terms of the FDPA, the district court could not impose the death penalty solely on the grounds that the jury found an aggravating factor and the requisite intent. Blakely, 542 U.S. at 305, 124 S.Ct. 2531. The statutorily authorized sentence increases to death only after the jury determines that the aggravating factors sufficiently outweigh the mitigating factors to justify the sentence of death, and not a moment before.
The language of § 3591 further supports this interpretation. According to its terms, a defendant found guilty of an underlying offense “shall be sentenced to death if, after consideration of the factors set forth in section 3592 in the course of a hearing held pursuant to section 3593, it is determined that imposition of a sentence of death is justified.” 18 U.S.C. § 3591(a). Section 3591 thus instructs us in two meaningful ways. First, § 3591 directs us to § 3593 as a whole rather than to any specific subsection. Second, § 3591 provides that a court cannot sentence a defendant to death until the jury determines that death is justified — i.e., after the jury weighs the aggravators and any mitigators pursuant to § 3593(e).
This makes the balancing of factors a “fact” for sentencing purposes under the FDPA. We were clearly instructed in Blakely that “the relevant ‘statutory maximum’ is not the maximum sentence a judge may impose after finding additional facts, but the maximum he may impose without any additional findings.” 542 U.S. at 303-04, 124 S.Ct. 2531. Here, without the balancing, the maximum sentence the judge can impose under the statute is life in prison. Because the death penalty could not be imposed by a judge under the FDPA but for the balancing by the jury— and the majority does not offer a colorable argument otherwise — whether the court *547 calls the jury’s balancing a “finding of fact,” a “mixed question of law and fact,” or “Mary-Jane” is irrelevant. “When a judge inflicts punishment that the jury’s verdict alone does not allow, the jury has not found all the facts which the law makes essential to the punishment, and the judge exceeds his proper authority.” Id. at 304, 124 S.Ct. 2531 (internal quotation marks and citation omitted).
At the very heart of Apprendi was a rejection of labels as a means of analyzing constitutional rights. 530 U.S. at 476, 120 S.Ct. 2348 (“Merely using the label ‘sentence enhancement’ to describe [one of the procedural safeguards] surely does not provide a principled basis for treating them differently.”). Because the clear language of the FDPA requires the jury to conduct this balancing before a defendant can be sentenced to death, the merits panel correctly held that “a jury’s finding that the aggravating factors' outweigh the mitigating factors is an element of the death penalty and must be found beyond a reasonable dopbt, the, same standard constitutionally required for, all. other findings of fact and mixed questions of law and fact.” Gabrion, 648 F.3d at 325.
2. “Death-Eligibility”
Rather than adhere to the Supreme Court’s directive to look beyond labels, the majority throws yet another label into the mix. Specifically, the majority contends that a defendant becomes “death-eligible” the moment that the jury finds a statutory aggravating factor beyond a reasonable doubt. Maj. Op. at 532, 533-34. Once “death-eligibility” attaches, the majority réasons, the jury need not make any additional findings of fact in order for the defendant to receive a sentence of death. Because this argument relies on unsupported assumptions and logical leaps, I cannot agree.
As an initial matter, I find the majority’s analysis as to when “death-eligibility” would attach to be unsatisfactory. In my view, choosing a point at which a defendant becomes so-called “death-eligible” under the FDPA other than .at the completion of a § 3593 hearing is nothing short of arbitrary. The majority’s brief analysis makes no effort to explain why a defendant would become “death-eligible” upon the jury’s finding an aggravating factor. Instead, the majority cites Jones v. United States, 527 U.S. 373, 119 S.Ct. 2090, 144 L.Ed.2d 370 (1999), a pre-Apprendi case that does not squarely address the issue, which in turn cites § 3593(e) for a general proposition.[8] Id. at 376-77, 119 S.Ct. 2090. But § 3593(e) does not include the term “death-eligible,” nor does it prescribe that “a. death sentence may not legally be imposed unless at least one aggravating factor is found to exist beyond a reasonable doubt,” as did the Arizona scheme in Ring. Ring, 536 U.S. at 597, 122 S.Ct. 2428 (internal quotation marks and alteration omitted). Under the FDPA, finding an aggravating factor beyond a reasonable doubt is one of many prerequisites to imposing the death penalty; it is not the point of no return.
I must also note that contrary to the majority’s suggestion, “death-eligibility” is not the cornerstone of Apprendi. Rather, *548 “death-eligibility” is an ambiguous term, used in a variety of ways depending on the jurisdiction. The majority makes no attempt to define this term or explain its importance. This is troubling, given that federal courts typically use this term as it relates to the FDPA to describe whether a defendant could ever receive a sentence of death based on his purported conduct, often at the indictment stage. See, e.g., United States v. Parks, 700 F.3d 775, 778 (6th Cir.2012) (“In enacting the FDPA, Congress increased the number of death-eligible offenses in toto.”); United States v. Lawrence, 555 F.3d 254, 264 (6th Cir.2009) (“Third, if the jury finds both a death-eligible offense and one or more of the statutory aggravating factors, the jury considers whether the statutory aggravating factor or factors found to exist, together with any non-statutory aggravating factors found to exist upon proof beyond a reasonable doubt, sufficiently outweigh the mitigating factor or factors found to exist, so as to justify a sentence of death.”). Moreover, there is nothing to support the theory that a jury ceases to find facts once “death-eligibility” attaches. The majority’s application of an undefined placeholder avoids engaging in a meaningful Ap-prendi analysis and raises more questions than it answers.
3. Weighing Evidence
Additionally, I cannot agree with the majority’s contention that weighing aggra-vators and mitigators is qualitatively different than finding facts for the purposes of Apprendi. Because the jury must weigh the aggravating factors against the mitigating factors under § 3593(e), the majority surmises, this determination cannot constitute a finding of fact. Maj. Op. at 532-33. According to the majority, the type of decision that has been deemed a finding of fact under Apprendi, such as whether a defendant was the triggerman, is binary, thus requiring only a response to a simple yes-or-no question.
This reasoning, however, misapprehends the function of the jury. Asking a jury to weigh evidence, in this case evidence that aggravates against evidence that mitigates, is not unique to the penalty phase of a capital trial. Rather, it is the sole task of a jury at every stage of every proceeding. Indeed, juries are frequently tasked with reaching subjective conclusions of great import beyond a reasonable doubt. See United States v. Gaudin, 515 U.S. 506, 514-15, 115 S.Ct. 2310, 132 L.Ed.2d 444 (1995) (holding jury’s responsibility often includes applying law to facts when drawing ultimate conclusions such as guilt, but that such conclusions must still be reached beyond a reasonable doubt).
When a jury determines whether a homicide was committed in self-defense, for example, it weighs the evidence presented at trial. Imagine a trial where the government presents testimony from eyewitnesses who describe a confrontation between the defendant and the victim. All agree that the defendant shot the victim, and all give the same general account of the victim’s actions preceding the shooting. The defendant takes the stand and testifies that he thought the victim was about to shoot him and therefore shot the victim first, in self-defense. During deliberations, the jury’s focus would not be on the type of binary yes-or-no fact finding contemplated by the majority. Rather, the jury would be required to engage in a balancing of the objective facts with personal and moral judgment to determine if it was reasonable for the defendant to think that the force he used was necessary to defend himself against an immediate threat. See Sixth Circuit Criminal Pattern Jury Instructions § 6.06 (2009). Jurors must deliberate on similar issues when considering a coercion/duress defense. *549 See id. § 6.05 (2009). These judgments are not binary yes-or-no decisions that depend on which version of the facts a jury believes. Rather, they entail value-laden balancing of the sort involved when a jury is asked to recommend life or death. See Brown v. Sanders, 546 U.S. 212, 216-17, 126 S.Ct. 884, 163 L.Ed.2d 723 (2006) (“[W]e have held that in all capital cases the sentencer must be allowed to weigh the facts and circumstances that arguably justify a death sentence against the defendant’s mitigating evidence.”). “While the question of innocence or guilt of the offense is essentially a question of fact, the choice between life imprisonment and capital punishment is both a question of underlying fact and a matter of reasoned moral judgment.” Sawyer v. Whitley, 505 U.S. 333, 370, 112 S.Ct. 2514, 120 L.Ed.2d 269 (1992) (Stevens, J., concurring).
Moreover, the comparison is not altered, as the majority suggests, by the formal nature of the penalty phase, in which the jury weighs only those facts that it has already specifically found as a special finding. Rather, the formality of the penalty phase serves as a safeguard against determinations made arbitrarily or for an impermissible reason, thus ensuring the constitutionality of the ultimate decision. Woodson, 428 U.S. at 305, 96 S.Ct. 2978 (“[T]he penalty of death is qualitatively different from a sentence of imprisonment, however long_Because of that qualitative difference, there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case.”); see also Franklin v. Lynaugh, 487 U.S. 164, 179, 108 S.Ct. 2320, 101 L.Ed.2d 155 (1988) (“Given the awesome power that a sentencing jury must exercise in a capital case, it may be advisable for a State to provide the jury with some framework for discharging these responsibilities.”); Lockett, 438 U.S. at 604, 98 S.Ct. 2954 (“We are satisfied that this qualitative difference between death and other penalties calls for a greater degree of reliability when the death sentence is imposed.”); Gregg, 428 U.S. at 192-93, 96 S.Ct. 2909 (“The idea that a jury should be given guidance in its decisionmaking is also hardly a novel proposition.”).
As explained in Gregg, “[w]here the sentencing authority is required to specify the factors it relied upon in reaching its decision, the further safeguard of meaningful appellate review is available to ensure that death sentences are not imposed capriciously or in a freakish manner.” 428 U.S. at 195, 96 S.Ct. 2909. Without such safeguards, “[a] system could have standards so vague that they would fail adequately to channel the sentencing decision patterns of juries with the result that a pattern of arbitrary and capricious sentencing like that found unconstitutional in Furman could occur.” Id. at 195 n. 46, 96 S.Ct. 2909. Much like the requirement that a jury make an individualized determination, the formal nature of the penalty phase under the FDPA preserves the constitutionality of the death penalty.
As with any decision that requires weighing factors — even factors that each objectively exist beyond a reasonable doubt — the proper weight itself can be difficult to decide. Is it really so surprising that some would weigh factors and answer “absolutely” and others would say “I think so?” And when the decision on the line is whether to take the life of another human, is it really too much to ask that the jury’s answer be “yes, beyond a reasonable doubt,” and not just “yes, I’m pretty sure?” See Ring, 536 U.S. at 589, 122 S.Ct. 2428 (“Capital defendants, no less than noncapital defendants, we conclude, are entitled to a jury determination of any fact on which the legislature conditions an increase in their maximum punishment.”).
*550 4. Sentencing Under 18 U.S.C. § 3553(a)
The majority also compares § 3593(e) with § 3553(a), implying that today’s decision may have an impact on sentencing under § 3553(a). As an initial matter, our ruling today cannot be incorrect merely because it may reveal potential problems with how courts have interpreted § 3553(a) to date. Our duty is to decide the case and controversy before us, not future cases or controversies that have not been presented to us. But more importantly, today’s analysis is not likely to impact how courts apply § 3553(a) during noncapital sentencing, as § 3553(a) is distinguishable from § 3593(e) for purposes of Apprendi. The parsimony provision instructs the judge to impose a sentence no “greater than necessary” to achieve the remaining sentencing objectives listed in the statute. Unlike the weighing in § 3593(e), such a finding does not increase the statutory maximum; indeed, in many ways § 3553(a) is Congress restating the principle that the statutory maximum is the “maximum [the court] may impose without any additional findings.” Blakely, 542 U.S. at 303-04, 124 S.Ct. 2531.
Furthermore, even if we could call it a factfinding, “[¡Judicial factfinding in the course of selecting a sentence within the authorized range does not implicate the indictment, jury-trial, and reasonable-doubt components of the Fifth and Sixth Amendments.” Harris v. United States, 536 U.S. 545, 558, 122 S.Ct. 2406, 153 L.Ed.2d 524 (2002). “[NJothing in [our] history suggests that it is impermissible for judges to exercise discretion — taking into consideration various factors relating both to offense and offender — in imposing a judgment within the range prescribed by statute.” Apprendi, 530 U.S. at 481, 120 S.Ct. 2348. The parsimony provision does not expand or contract the range prescribed by statute, but merely codifies these principles to reflect Congress’s position on the extent of discretion federal district judges should have when imposing sentences within the permissible range. Given these critical distinctions, I cannot agree with the majority’s conclusion that § 3553(a) and § 3593(e) are indistinguishable for the purposes of Apprendi.
II. VOIR DIRE
Gabrion argues that his Sixth and Fourteenth Amendment rights to an impartial jury were violated by the district court’s biased exclusions of jurors for cause. Specifically, Gabrion outlines three ways in which these rights were violated: (1) the district court erred by excluding four jurors who leaned against the death penalty, (2) the district court erred by not having excluded three jurors who leaned in favor of the death penalty, and (3) the district court’s exclusion and inclusion of these jurors resulted in a venire tilted toward capital punishment. The majority deems each of these arguments meritless in light of the broad discretion afforded to the district court when selecting a jury. Because I believe that the district court improperly excluded two jurors, which resulted in a venire tilted in favor of capital punishment, I cannot agree.
A. Exclusion of Anti-Death-Penalty Jurors
Gabrion argues that his death sentence is unconstitutional based on the exclusion of four death-qualified jurors who were improperly excluded from the venire: Abrahams, Donahey, Hemmeke, and Groves. The majority rejects this argument, highlighting the discretion a district court holds in selecting a jury. The voir-dire transcript demonstrates, however, that both Abrahams and Donahey each clearly stated multiple times that despite *551 their personal misgivings about the death penalty, they would be able to follow the instructions of the district court and follow their oaths. This is all the law requires.
The government faces a significant burden when it wishes to remove a juror for cause, for its “power to exclude for cause jurors from capital juries does not extend beyond its interest in removing those jurors who would frustrate the State’s legitimate interest in administering constitutional capital sentencing schemes by not following their oaths.” Gray v. Mississippi 481 U.S. 648, 658, 107 S.Ct. 2045, 95 L.Ed.2d 622 (1987). When the government seeks to exclude a juror for bias, it “must demonstrate, through questioning, that the potential juror lacks impartiality. It is then the trial judge’s duty to determine whether the challenge is proper.” Morgan v. Illinois, 504 U.S. 719, 783, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992) (internal quotation marks and emphasis omitted). Quite simply, I do not believe the government established a lack of impartiality here.
When a juror is excluded improperly for cause on the basis that she opposes the death penalty, the sentence of death is rendered unconstitutional. Adams v. Texas, 448 U.S. 38, 51, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980) (“Accordingly, the Constitution disentitles the State to execute a sentence of death imposed by a jury from which such prospective jurors have been excluded.”). Because I believe that the district court erred in excluding Abrahams and Donahey, both of whom stated clearly that they could put their personal beliefs to the side in order to follow the instructions of the court, I would vacate Gabrion’s sentence.
1. Abrahams
The district court explained its reasoning for excluding Abrahams as follows: ‘Well, I think there are two issues here. He can consider both.... Would he — not would he, could he impose either one? And when it says could he impose either one, on the government’s question and on my question he said I don’t know. Now he says he’ll consider it.” 2 Jury Trial 562:19-24. The district court then reasoned that although “normally I would say if he says I’ll consider both of them, that’s normally all right. But if it’s preceded with I don’t know if I could do it and then I ask him, Could you, and he says I don’t know, I think it’s grounds for excusal.” Id. at 563:2-6. The district court coined this a “close question,” but ultimately determined “it’s grounds for excusal because of his hesitancy and the honesty with which he’s approached it.” Id. at 563:6-8.
As an initial matter, “[i]t is important to remember that not all who oppose the death penalty are subject to removal for cause in capital cases; those who firmly believe that the death penalty is unjust may nevertheless serve as jurors in capital cases so long as they state clearly that they are willing to temporarily set aside their own beliefs in deference to the rule of law.” Lockhart v. McCree, 476 U.S. 162, 176, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986). “[I]t cannot be assumed that a juror who describes himself as having conscientious or religious scruples against the infliction of the death penalty or against its infliction in a proper case thereby affirms that he could never vote in favor of it or that he would not consider doing so in the case before him.” Witherspoon v. Illinois, 391 U.S. 510, 515 n. 9, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968) (internal quotation marks and citation omitted); see also id. at 529, 88 S.Ct. 1770 (Douglas, J., concurring) (“Those with scruples against capital punishment can try the case according to the law and the evidence, because the law does not contain the inexorable command of an *552 eye for an eye.”) (internal quotation marks omitted).
Taken in context, Abrahams’s hesitancy clearly relates to how he would weigh the aggravators and mitigators in order to reach an ultimate decision, not to whether he would be able to engage in such a task. And it is clear that the former does not reflect the sort of partiality that requires excusal for cause. Abrahams’s hesitancy is first seen during the initial line of questioning:
THE COURT: Could you do that if the instructions of this Court and the law dictated that?
JUROR ABRAHAMS: Um, I believe on my questionnaire that I said that I would be fair in a judgment of the death sentence. But in the past couple of weeks I’m not really unclear, but I’m more unsure of if I could outweigh the sentence of life imprisonment over death or vice versa. It’s just something that I’ve never had to deal with or — excuse me, so it’s—
THE COURT: Right. That can be appreciated. I think the inquiry at this point is if you made up your mind or if you would follow the facts and follow the law—
JUROR ABRAHAMS: Yes.
THE COURT: —and be able to fairly, impartially impose either one of them if the evidence and the law dictated that. JUROR ABRAHAMS: Yes, sir.
2 Jury Trial 554:3-19. Gabrion’s attorney then asked Abrahams similar questions:
MR. STEBBINS: ... Now, do you think you can consider these options at that point, listen to this evidence and fairly consider whether the death sentence is appropriate or a life sentence is appropriate?
JUROR ABRAHAMS: At this point, yes, I do believe that I could.
MR. STEBBINS: You could consider that?
JUROR ABRAHAMS: I could consider it, yes.
MR. STEBBINS: And you don’t think anything in your thoughts you’ve had, these concerns you’ve had over the last couple of weeks will prevent you from making that determination?
JUROR ABRAHAMS: I don’t think it would prevent me, no, sir. It’s just a consideration that I wish to be heard. That’s all I had.
Id. at 560:6-20. When the district court reconvened its questioning, Abrahams did not waffle as to his ability to impose a death sentence, as described by the majority. Rather, Abrahams stated clearly for a third time that imposing the death sentence is something he “could seriously consider if the facts and circumstances were such that it was open for consideration.” Id. at 561:6-9. Abrahams then repeated his earlier hesitancy as to which he would choose:
That’s what I’m trying to express, that I don’t know for sure that I could go through the whole trial and, for instance, them prove him guilty and then go through the second part of the trial for sentencing, that I could say life imprisonment or death. I honestly don’t know. That’s the point that I was trying to get across. Very unsure of what I could say yes or no to, either way.
Id. at 561:15-22.[9] Here, Abrahams is not stating that a personal viewpoint would *553 preclude him from finding that death is justified. Rather, he is expressing that he has no preconceived notion of how he would react to this unique process, and “neither nervousness, emotional involvement, nor inability to deny or confirm any effect whatsoever is equivalent to an unwillingness or an inability on the part of the jurors to follow the court’s instructions and obey their oaths, regardless of their feelings about the death penalty.” Adams, 448 U.S. at 50, 100 S.Ct. 2521.
Concerning the statements to which the majority directs us — Abrahams’s admission that his moral values would be on his mind while deliberating as to life or death — the Supreme Court has stated that the government cannot “exclude jurors whose only fault was to take their responsibilities with special seriousness or to acknowledge honestly that they might or might not be affected.” Id. at 50-51, 100 S.Ct. 2521. If a juror states consistently that he would be able to apply the law to the facts notwithstanding his moral beliefs, he cannot be excluded for cause. Abra-hams did not resist rehabilitation, as suggested by the majority; he simply continued to express hesitancy as to the great responsibility he would be undertaking as a juror, which has never been sufficient to require exclusion. The majority’s stated reasons for upholding the district court’s exclusion of Abrahams are thus contrary to binding authority and the plain language of the voir-dire transcript.
2. Donahey
The majority employs a similar approach with respect to Donahey, claiming that he equivocated and rendered ambiguous answers. However, I cannot agree. Donahey opposed the imposition of the death penalty on a personal level, yet was adamant in stating that he would temporarily yield these beliefs to fulfill his duty as a juror. When initially questioned by the court as to his moral views regarding the death penalty, Donahey responded as follows:
THE COURT: No, I understand. And so the question comes down to whether you could impose it or whether you would find yourself unable to.
JUROR DONAHEY: Okay. So I interpreted that as whether — I mean, if it was up to me.
THE COURT: Oh, okay.
JUROR DONAHEY: You know what I’m saying? That’s the way I interpreted it. So you’re saying that if all the factors came out in the mitigating, because the law says it’s a possibility, could somebody find it. And I suppose, as personally distasteful as it would be, I would have to go with it.
THE COURT:- Which means?
JUROR DONAHEY: I would follow what the law would tell me to do on that.
1 Jury Trial 93:18-94:7. Donahey thus falls squarely within the category of jurors described in Lockhart as being death-qualified — those who personally oppose the death penalty yet affirm their ability to put their views to the side in order to adhere to their oath as a juror. 476 U.S. at 176, 106 S.Ct. 1758.
The majority insists, however, that Do-nahey equivocated, pointing to a statement where he describes his personal views on the death penalty, as is made evident when placed in context:
MR. DAVIS: In answering the question that was put to you by the questionnaire, you said that the death penalty was morally wrong.
*554 JUROR DONAHEY: Um-hum.
MR. DAVIS: Could you explain that?
JUROR DONAHEY: Well, as I expressed, if we’re trying to have a society that says, you know, killing is wrong, yet we invoke that as a punishment, there seems to be something contradictory there. I mean, our laws and stuff are reflective of our morals, and then there’s a contradiction there. And then particularly in the recent past there seems to be with now DNA testing more and more verdicts that have been overturned. People that have been sentenced to die were cleared eventually. And to take life because they took someone else’s life, you know, somewhere down inside me, it just doesn’t seem right, you know.
So maybe when I say morally, maybe I could have expressed it a little better. But I wasn’t looking at — you know, I was filling something out, you know, basically to get it done with and not writing some kind of, you know, paper on it, you know.
1 Jury Trial 94:16-95:11.[10] Later in the same colloquy, Donahey responded to a question that his views on the death penalty might interfere with his ability to make a judgment. Id. at 95:16-20. Donahey expanded on this answer in response to a question by Gabrion’s attorney, stating that the decision “would be very difficult” but that he “could consider” the death penalty. Id. at 98:24-99:8.
The majority and the district court both contend that Donahey equivocated as to whether he could consider imposing a sentence of death. Id. at 100:21-24. My review of the voir-dire testimony, however, reveals no evidence of this purported equivocation. Donahey expressed that he personally opposed the death penalty, but stated that as a juror he would follow the instructions of the court, “as personally distasteful as it would be.” Id. at 94:2-3.[11] Moreover, as evidenced by the above-quoted testimony, the district court’s statement that Donahey “was unable to say that he would be able to” consider the death penalty is plainly incorrect. Id. at 101:1-2.
Additionally, I find it contradictory for the majority to disregard Donahey’s statement that he would be able to consider imposing the death sentence because “that answer came in response to a leading question,” yet rely heavily on “a leading question from the prosecutor, that his views about the death penalty ‘might’ interfere with his ‘ability to make a judgment as to sentencing.’ ” Maj. Op. at 528. Finally, I am unclear as to why any pur *555 ported ambiguity in Donahey’s testimony should play a role in the analysis, given that this was not a reason proffered by the district court for excluding Donahey. The majority does not explain why this should be considered by this court, nor does it explain how Donahey’s testimony was in fact ambiguous. Ultimately, Donahey was improperly excluded by the district court as a result of his personal opposition to the death penalty.
3. Groves
Although I agree with the majority that the first two reasons given by the district court were sufficient to exclude Groves, I do not agree with the district court’s insinuation that Groves could have been excluded based on his view that the death penalty should be reserved for extreme cases, such as those involving mass murders. 2 Jury Trial 885:1-2. The Supreme Court has stated expressly that jurors “cannot be excluded for cause simply because they indicate that there are some kinds of cases in which they would refuse to recommend capital punishment.” Witherspoon, 391 U.S. at 522 n. 21, 88 S.Ct. 1770; see also Gregg, 428 U.S. at 182, 96 S.Ct. 2909 (“Rather, the reluctance of juries in many cases to impose the sentence may well reflect the humane feeling that this most irrevocable of sanctions should be reserved for a small number of extreme cases.”). This is because “a prospective juror cannot be expected to say in advance of trial whether he would in fact vote for the extreme penalty in the case before him.” Id.
B. Venire Tilted in Favor of Capital Punishment
Contrary to the majority’s assertion, Ga-brion has identified a constitutional basis for his claim that the jury-selection process was lopsided: “a criminal defendant has the right to an impartial jury drawn from a venire that has not been tilted in favor of capital punishment by selective prosecutorial challenges for cause.” Uttecht v. Brown, 551 U.S. 1, 9, 127 S.Ct. 2218, 167 L.Ed.2d 1014 (2007). Because the district court improperly excluded jurors based on their personal beliefs on the death penalty, I believe the venire in Ga-brion’s case was tilted in favor of capital punishment. I would vacate Gabrion’s death sentence on this ground for the reasons stated above.
III. CONCLUSION
For all of these reasons, I respectfully dissent. I would vacate Gabrion’s sentence of death and remand for a new penalty hearing.

. The majority references the correct standard at one point in its opinion, yet bases its analysis wholly on the moral-culpability and character-of-the-defendant factors.

. The Seventh Circuit’s opinion in United States v. Johnson, 223 F.3d 665 (7th Cir.2000), is not instructive. Gabrion did not seek to introduce evidence that the death penalty is immoral. He sought to introduce evidence relating to an element of the offense of which he was convicted. In other words, . Gabrion -sought to proffer evidence supporting an argument “against sentencing, this defendant to death.” Id. at 675. Additionally, insofar as the majority assumes Gabrion’s evidence can be presented only in generalities, the Supreme Court has explained that although "[i]t might seem, then, that .[certain types of evidence] apply to every eligible defendant!,] • • • that cannot be correct.” Jones v. United States, 527 U.S. 373, 401, 119 S.Ct. 2090, 144 L.Ed.2d 370 (1999).. As applied to the context of victim-impact statements, the Supreme Court stated that "[e]ven though the concepts of victim impact and victim vulnerability may well be relevant in every case, evidence of victim vulnerability and victim impact in a' particular case is inherently individualized.” Id. The same is true of the evidence Gabrion sought to present relating to the location of the offense.

. The majority’s citations to cases that discuss the moral culpability of the defendant áre unpersuasive. As an initial matter, it is unsurprising that the Supreme Court has made statements regarding the significance of moral culpability in mitigation; it is, after all, one of the categories that the Supreme Court itself has outlined. What the majority here continues to disregard, however, is that "circumstances of the offense” is also a category incorporated by the Supreme Court. In fact, Penry v. Lynaugh, 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989), a case cited by the majority, expressly includes this category: “[T]he Eighth and Fourteenth Amendments require that the sentencer not be precluded from considering, as a mitigating factor, any aspect of a defendant’s character or record and any of the circumstances of the offense.” Id. at 317, 109 S.Ct. 2934 (internal quotation marks omitted).
Moreover, I must point out that the majority’s reliance on Tennard and Enmund v. Florida, 458 U.S. 782, 102 S.Ct, 3368, 73 L.Ed.2d 1140 (1982), for the proposition that mitigation is only a moral concept is misplaced. In Enmund, the Supreme Court discussed the *540 personal culpability of the defendant in the context of the imposition of the death penalty on a non-triggerman, not as a general matter. 458 U.S. at 797-801, 102 S.Ct. 3368. With respect to Tennard, the majority omits the surrounding text of the sentence that it quotes. When read in context, the paragraph clearly establishes the inclusive nature of the mitigation standard. It does not prohibit admission of the circumstances of the crime, as the majority’s selective quotation insinuates. The entirety of the cited paragraph states as follows:
We have never denied that gravity has a place in the relevance analysis, insofar as evidence of a trivial feature of the defendant's character or the circumstances of the crime is unlikely to have any tendency to mitigate the defendant's culpability. However, to say that only those features and circumstances that a panel of federal appellate judges deems to be severe (let alone uniquely severe) could have such a tendency is incorrect. Rather, the question is simply whether the evidence is of such a character that it might serve as a basis for a sentence less than death.
Tennard, 542 U.S. at 286-87, 124 S.Ct. 2562 (internal quotation marks and citations omitted) (emphasis added).

. The result of the majority’s analysis is to exclude from the penalty phase evidence that was presented during the guilt phase. However, the bifurcated nature of a capital trial was not established in order to restrict the jury’s consideration of evidence related to the circumstances of the offense. Rather, it was, created in order to enable the jury to consider more information about the defendant than that which would be admissible when determining the question of guilt: "When a human life is at stake and when the jury must have information prejudicial to the question of guilt but relevant to the question of penalty in order to impose a rational sentence, a bifurcated system is more likely to ensure elimination of the constitutional deficiencies identified in Furman." Gregg, 428 U.S. at 191-92, 96 S.Ct. 2909.

. The majority’s comparison of an element of the offense to the "moonphase that day” underscores its unwillingness to engage in a meaningful analysis of the third category the Supreme Court has outlined as mitigation'— circumstances of the offense. The majority’s comparison of the location of the body to the moonphase that day is apt in one respect, however. During the guilt phase, the jury, too, was likely to have regarded the disputes over where Timmerman died and whether she was asphyxiated or drowned as no more relevant to the question of Gabrion’s guilt than the moonphase that day. Jurors convinced beyond a reasonable doubt that a defendant has murdered in cold blood are highly unlikely to then find the defendant not guilty based on doubts as to the location of the murder or the manner of death. In the face of overwhelming evidence that Gabrion murdered Timmerman, the jurors likely spent little time *541 focusing on the seemingly irrelevant question whether the murder took place on federal lands or the degree to which they were convinced of that morally irrelevant fact. But, having rendered a guilty verdict, and then turning to the question whether Gabrion should receive the death penalty, some jurors might have viewed the morally irrelevant issue of the location of the murder as having new significance, far more relevant than the moonphase that day, had they been informed that the location was the single factor that made the murder a federal crime, thereby exposing Gabrion to the death penalty, which would not have been an option had the murder been committed 227 feet to the north.

. I agree with Gabrion that the government's suggestion that Gabrion's counsel could have made this argument anyway is absurd in light of the district court’s ruling specifically pro *545 hibiting this testimony. See Supplemental Appellee Br. on Reh’g at 21-22; Supplemental Reply Br. on Reh’g at 12.

. Everyone agrees that § 3593(e) itself states no burden of persuasion on this issue. Some state statutes, however, do explicitly provide that the jury must find that the aggravators must outweigh the mitigators beyond a reasonable doubt. Gabrion, 648 F.3d at 326 (6th Cir.2011).

. The six circuit courts to have addressed this issue thus far mirror the majority’s approach and are also lacking in any statutory analysis. See Runyon, 707 F.3d at 516; United States v. Fields, 516 F.3d 923, 950 (10th Cir.2008); United States v. Mitchell, 502 F.3d 931, 993-94 (9th Cir.2007), cert. denied, 553 U.S. 1094, 128 S.Ct. 2902, 171 L.Ed.2d 843 (2008); United States v. Sampson, 486 F.3d 13, 32 (1st Cir.2007); United States v. Fields, 483 F.3d 313, 345-46 (5th Cir.2007), cert. denied, 552 U.S. 1144, 128 S.Ct. 1065, 169 L.Ed.2d 814 (2008); United States v. Purkey, 428 F.3d 738, 750 (8th Cir.2005).

. It is important to note that unlike with juror Groves, whose exclusion Gabrion also challenges, the district court did not make note of any nonverbal indications that Abrahams would be unable to consider imposing a sentence of death. When giving his reasoning regarding Groves, the district court stated "I think in the context of his saying, Yes, I could *553 consider it, and he winces and bobs and weaves a little bit when he does that, I think he's really not qualified.” 2 Jury Trial 385:4-7.

. It is clear from the transcript that Donahey was confused by the wording of this question on the questionnaire. In both passages, Do-nahey explains his initial confusion when he filled out the questionnaire, as he thought it was asking about his personal beliefs. Once the judge clarified that the critical issue is whether he could follow his oath despite those beliefs, Donahey stated clearly that he would be able to follow instructions and place his personal beliefs aside. The selective quotations cited by the majority do not reflect this dynamic of Donahey’s voir dire.

. Comparing Donahey’s statements with those made by Hemmeke, another juror whose exclusion Gabrion challenges, is instructive. Unlike Donahey, Hemmeke responded on his questionnaire that he "could never, regardless of the facts and circumstances, return a verdict which imposed the death penalty.” 2 Jury Trial 509:24-510:1. Further contrary to Donahey, Hemmeke answered the district court’s initial inquiry as to whether he could consider imposing a sentence of death by stating, "I’m pretty set in the no death penalty.” Id. at 511:1. These kinds of statements, that go to one’s ability to consider imposing the death penalty, differ vastly from those made by Donahey, who established that although he personally opposed capital punishment, he would put those views aside for the purposes of deliberations.